## In re Condemnation of Land

*J. Boyd Landis*, *W. E. Shissler* and *James Bowman*, for petitioners.

*Clinton R. Weidner* and *John E. Myers*, contra.

JACOBS, J., January 24, 1957.—On October 15, 1953, the school districts of the Borough of Lemoyne, the Borough of New Cumberland, the Borough of Wormleysburg and the Township of Lower Allen, all in Cumberland County, and the school districts of the Borough of Goldsboro, the Borough of Lewisberry, the Township of Fairview and the Township of Newberry (first voting district), all of York County, entered into an agreement forming the West Shore Joint Senior High School.

The agreement provided for the establishment of a joint school committee to which each constituent school board should appoint one or more members. The joint school committee was given power to operate the schools and conduct the affairs of the joint school board "with such exceptions as are specified in the school laws of the Commonwealth of Pennsylvania", and with the following proviso: "The election and dismissal of professional personnel, selection of sites, and the approval of building programs shall be performed by the joint board."

In paragraph 12 of the jointure agreement, it was provided that the legal title to all lands, buildings, additions and equipment purchased by the joint board for its use should remain in the joint ownership of the constituent school districts.

In the fall of 1953, after the jointure agreement was signed, representatives of the joint board talked with Willard F. Keiser, Jr., about purchasing some 60 acres of his land in Lower Allen Township for school purposes. At that time an offer of $1,000 an acre was made to Mr. Keiser, which he refused to accept. Mr. Keiser, in his refusal, indicated that he was not interested in selling his land.

In the early part of March 1954 a committee of the joint board called on Willard F. Keiser, Jr., and asked for a price on approximately 44 acres of the land before mentioned. No offer was made by any of the negotiating parties. On March 2, 1954, the Joint School Board of the West Shore Senior High School adopted a resolution selecting a tract of 45.7 acres of the land heretofore mentioned as a site for a proposed West Shore Joint Senior High School, and requested the School District of Lower Allen Township to acquire the land by purchase or condemnation. On May 3, 1954, the School District of Lower Allen Township sent a letter to Willard F. Keiser, Jr., offering

him $45,700 for the tract of land chosen. Mr. Keiser refused to accept this offer. Although asked for an alternative price, Mr. Keiser never communicated any price which he was willing to accept to the Board of School Directors of Lower Allen Township. The Board of School Directors of Lower Allen Township then proceeded to adopt a condemnation resolution, and on November 29, 1954, filed a petition for the appointment of viewers. This petition set forth the fact that the land was being acquired by the School District of Lower Allen Township as a site for the proposed West Shore Joint Senior High School. Mr. Keiser understood during the condemnation proceedings taken by the School District of Lower Allen Township that the land was to be used for the erection of a high school for the jointure. These proceedings were filed in the Court of Common Pleas of Cumberland County, to no. 505, December term, 1954. On November 12, 1955, the proceedings by the School District of Lower Allen Township were discontinued by order of court, after notice to the landowner. The apparent reason for discontinuing the proceedings to no. 505, December term, 1954, was the fact that the petition for the appointment of viewers had named Willard F. Keiser, Jr., as the sole owner of the land, whereas he and his wife, Anna M. Keiser, owned the land as tenants by entireties, and the petition was demurred to by Willard F. Keiser, Jr., on that ground.

On August 23, 1955, the attorneys for the joint school board wrote a letter to Willard F. Keiser, Jr., and Anna M. Keiser, his wife. In that letter they stated that the joint school board and the School Districts of the Borough of Lemoyne, the Borough of Wormleysburg, the Township of Lower Allen and the Borough of New Cumberland had selected the said 45.7 acres in Lower Allen Township for school purposes. The letter offered to pay the Keisers $51,184

for the tract of land, and asked the Keisers either to accept the offer or give a price which they were willing to accept. Mr. and Mrs. Keiser never replied to this letter and on November 16, 1955, four days after the proceeding instituted by the School District of Lower Allen Township had been discontinued, a petition for the appointment of viewers was filed on behalf of the school districts of the Township of Lower Allen, the Borough of New Cumberland, the Borough of Lemoyne and the Borough of Wormleysburg, to no. 382, December term, 1955. This proceeding was discontinued by order of court on March 13, 1956, counsel for the landowners being present in court at that time and making no objection thereto. The Keisers, some time in 1955, had conveyed two small sections of this land to their two sons, Albert Leon Keiser and James Franklin Keiser, and they objected to this proceeding for failure to join their two sons. It was for this reason, among others, that a petition for discontinuance was filed.

The joint board, on February 16, 1956, adopted three resolutions selecting for a school site the same 45.7 acres of land in Lower Allen Township. The resoutions were drawn so as to cover the portions of the land owned by Willard F. Keiser, Jr., and his wife and his two sons, Albert Leon Keiser and James Franklin Keiser. The resolutions authorized special counsel, Clinton R. Weidner, Esq., to make offers to the owners and to negotiate for the purchase of the tract. On February 25, 1956, Clinton R. Weidner, Esq., sent a letter to Willard F. Keiser, Jr., and Anna M. Keiser, his wife, offering $49,728 for the portion of the land owned by Willard F. Keiser, Jr., and Anna M. Keiser, his wife. Similar letters were sent on the same date to James Franklin Keiser and Albert Leon Keiser offering each of them $728 for the portion of the land owned by them. Willard F. Keiser, Jr., and

his wife owned 44.40 acres of the land and each of the boys owned 65/100th of an acre.

Mr. Weidner telephoned Willard F. Keiser, Jr., prior to the receipt of this letter and told him to disregard it because a meeting was set between the parties. That meeting was fixed for March 15, 1956. The meeting was held in Willard F. Keiser, Jr's., office in Harrisburg. The meeting started at 2:30 p.m. and ended around 4:45 p.m. At that meeting Willard F. Keiser, Jr., was authorized to negotiate for his wife and his two sons. Mr. Weidner was authorized to negotiate for the joint board. At that meeting the representatives of the joint school board presented a plan showing exactly what was being taken. Mr. Keiser suggested several other sites which were owned by other people. Mr. Keiser gave figures as to the value of his land as follows: $309,061.79 for the portion of the land owned by Willard F. Keiser, Jr., and wife, $9,000 for the land owned by James Franklin Keiser and $7,750 for the land owned by Albert Leon Keiser. These figures, Mr. Keiser stated, were subject to negotiation, and were not closed figures. In reply to Mr. Keiser's statements in regard to value, Mr. Weidner said that the appraisers employed by the joint school had given figures that were less than half of the valuation placed on the land by Mr. Keiser. The representatives of the joint school board made no counter-offer at that meeting. Although Mr. Keiser stated that the price was open to negotiation he admitted later under cross-examination that on that day he would not have accepted an offer of $250,000 for the land.

On that night, following the conference, the joint board and all the constitutent school districts making up the joint board passed a resolution to the effect that they were unable to agree on the terms of purchase of the said tracts of land and condemned the same for school purposes. The land was entered upon and the

boundaries marked on March 16, 1956. Petitions for the appointment of viewers were filed by the joint board to the numbers and terms set forth in the caption of this case, on April 5, 1956, and viewers were appointed by the court. On May 1, 1956, the landowners filed petitions in each case to strike off the appointment of viewers. Answers were filed by the joint board to the petitions to strike and testimony was taken before the writer of this opinion on July 2, 1956, July 5, 1956 August 9, 1956, and September 8, 1956. The matter was argued before the court on November 27, 1956.

The facts and issues in each of the three numbered cases are the same. They are, therefore, treated by the court as one case and this opinion and order are applicable in each of the three cases.

In their exceptions to the appointment of viewers and in their argument, the landowners have raised six fundamental objections to the condemnation proceedings instituted by the filing of petitions by the joint board on April 5, 1956. We will treat these objections in the order in which they have been raised by the landowners.

*1. May school jointures be created across county lines?*

The landowners claim that since there is no statute expressly authorizing the creation of joint schools across county lines the same cannot be done.

Section 1701 of the Public School Code of March 10, 1949, P. L. 30, as amended, 24 PS §17-1701, provides as follows:

"The board of school directors in any two or more school districts may, with the approval of the county board of school directors and of the Department of Public Instruction, establish, construct, equip, furnish, and maintain joint elementary public schools, high schools, consolidated schools or any other kind of schools or departments provided for in this act."

The word "any" modifying "two or more school districts" implies that there is no limitation on what school districts may form a jointure. The words appearing later in the same sentence calling for the approval of "the county board of school directors" throw some doubt on the territorial extent of the jointure intended to be authorized. It, therefore, becomes obvious that the words of this statute are not clear and free from all ambiguity. Under those circumstances the intention of the legislature should be ascertained.

Section 51 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §551, states, inter alia, as follows:

"When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters-(1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be obtained; (5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of such law."

Two of the matters to be considered in determining legislative intent seem particularly applicable in this situation.

The object to be obtained by the legislature was fundamentally a better education for the children of the Commonwealth. The broadening of the general education base, increased building costs and improved transportation facilities have made it advisable and economical for school districts to combine their resources and facilities. See Walker's Appeal, 332 Pa. 488. These improved facilities were part of the object to be attained by allowing jointures. This object would

be hindered by an interpretation refusing jointures across county lines.

Counsel for the joint board has pointed out a recent legislative amendment to the Public School Code. Section 901 of the code, 24 PS §9-901, was amended in 1956 to regulate voting by school directors in a district which has joined with districts of another county in establishing joint schools at conventions and special meetings of county school directors. This section gives legislative recognition to the fact that joint school districts across county lines do exist. In the opinion of this court this is a legislative interpretation of the prior existing provisions of the Public School Code and as such is to be given consideration in determining the validity of school jointures across county lines. Counsel for the landowners have asked us to consider provisions of the School Code having to do with the creation of independent school districts and the merger of school districts in construing section 1701 of the code. They can therefore hardly object to our giving consideration to the 1956 amendment to section 901.

In our decision in regard to the validity of jointures across county lines we are also influenced by the provisions of section 52 of the Statutory Construction Act, 46 PS §552, wherein it is provided that in ascertaining the intention of the legislature the courts may be guided by the presumption that the legislature intends to favor the public interest as against any private interest. The need for better and more economical schools is a public need. The attempt of the various school districts forming the jointure to meet this need is an attempt made on behalf of the public interest. Geographically the jointure across county lines is deemed by the various boards of school directors to be to the advantage of all districts concerned. The legislature must have intended to foster and promote this public interest by permitting jointures

across county lines where the same are deemed most advantageous in the opinion of the concerned school districts. This presumption supports a finding that the legislature intended to authorize by implication jointures across county lines.

We hold that the Joint Board of the West Shore Joint Senior High School, of Cumberland County, was properly and legally formed under the provisions of the Public School Code of 1949, as amended.

*2. Did the county boards of school directors of York and Cumberland counties approve the site selected?*

The applicable section of the Public School Code of 1949 is section 701, 24 PS §7-701, which imposes the duty on each board of school directors to provide the necessary grounds and suitable school buildings in their district and ends with the following words:

"In all school districts under the direction of a county superintendent, all grounds and the plans for all buildings shall be approved only with the advice and consent of the county board of school directors."

We interpret this to mean that the county board of school directors must give their approval to the site of a proposed new building.

On April 9, 1954, the State Council of Education notified the West Shore Joint Senior High School Board that it had approved the site selected by the board, a description of the site being attached to the approval. The description attached to said approval described a tract of land in Lower Allen Township, containing 45.7 acres, being the same tract now condemned by the joint board in the three cases before the court. Prior to that time, to wit, on March 24, 1954, the York County School Board met and passed a resolution. The minutes of the meeting show that this resolution was passed after representatives of the joint board had asked the county board for its ap-

proval of a site of approximately 45 acres in Lower Allen Township, Cumberland County, for a high school building because four school districts from York County, namely, Goldsboro and Lewisberry Borough, part of Newberry Township and Fairview Township, were represented in the jointure. The resolution recited that the York County School Board felt that it was without jurisdiction to make any recommendation with respect to a site situate outside of York County. The resolution, however, recited that it was the desire of the York County School Board to cooperate with the four districts which had gone in with the four Cumberland County districts and the York County Board consented to the action taken by the four school districts of York County with respect to the building program and the selection of the site. We consider this to be "the advice and consent of the York County Board." We fail to see how it can be interpreted otherwise when the resolution plainly set forth that the board "consents" to the action taken by the York County districts.

On March 18, 1954, the County Board of School Directors of Cumberland County met and approved the site "of approximately 45 acres, upon which it is now proposed to construct the West Shore Joint Senior High School."

Having thus received the consents of the two county boards and the approval of the State Council of Education, the joint board, on February 16, 1956, passed the necessary resolutions selecting the site for school purposes.

The landowners make much of section 925 of the Public School Code, 24 PS §9-925, which enumerates the powers and duties of county boards of school directors. One of the powers and duties is "to recommend the approval or disapproval of school sites and buildings by the State Council of Education." No-

where does the act set forth a penalty for failure to do this and we are of the opinion that the failure to so recommend would not vitiate proceedings taken after approval had been given by the State Council of Education. However, joint board exhibit no. 1, being a letter from the Department of Public Instruction, recites that the petition for approval of the establishment of the new high school was submitted by the Cumberland and York County Boards of School Directors. The resolution passed by the York County Board of School Directors recites that the school districts making up the jointure did ask the York County Board to recommend approval of the site to the State Council of Education, and this resolution was apparently forwarded to the Department of Public Instruction where it was considered as a recommendation for approval. The resolution of the Cumberland County Board of School Directors, joint board exhibit no. 5, clearly sets forth that they had received an application to recommend for approval and that such application was approved.

We are satisfied that both county boards of school directors did approve the site and did recommend the approval of the site to the State Council of Education. We are further of the opinion that any defects in the recommendations to the State Council are cured by the approval given by the State Council of Education set forth in joint board exhibit no. 2.

### 3. Has a joint school board the power of condemnation?

The landowners contend that the joint school board has no power to condemn because there is no statutory authority for such condemnation and because of the rule of strict construction, such power cannot be implied from the statutory enactments but must be explicitly given.

We are aware that statutes conferring the power of eminent domain are to be strictly construed: 46 PS §558. However, we do not believe this rule of construction requires us to give the Public School Code its narrowest meaning and ignore evident legislative purpose and common sense. For an analogous situation see statement of the Pennsylvania Supreme Court relative to the strict construction of penal statutes under the same section of the Statutory Construction Act in Commonwealth v. Mason, 381 Pa. 309.

Section 1701 of the Public School Code of 1949, 24 PS §17-1701, provides, inter alia, as follows:

"The board of school directors in any two or more school districts may—establish, construct, equip, furnish, and maintain joint elementary public schools, high schools, consolidated schools or any other kind of schools or departments provided for in this act."

Having thus established the joint school, we turn to section 1704 of the same act, 24 PS §17-1704, for the authority of joint boards, where we find the following language:

"The affairs of joint schools or departments shall be supervised and directed (1) jointly by the several boards of school directors, establishing and maintaining such joint schools or departments, or (2) by a joint school committee, as provided in section one thousand seven hundred seven of this act. When there is no joint school committee, the several boards of school directors are hereby authorized to meet jointly, and exercise the same power and authority over the same as the several boards exercise over the schools in their respective districts. Whatever matter is required by law to be decided by a vote of the majority of all the directors of a school district shall in a joint school or department be required to be decided by a vote of two-thirds of all the constituent boards comprising said joint operation. The vote of any constitu-

ent board shall be determined by a majority vote of all the school directors comprising such constituent board. In addition thereto, the matter shall have been voted for by a majority of all the school directors of all the constituent boards. The title to any real estate, acquired for the purpose of establishing any such joint school or department, shall be held in the name of one or more of the districts establishing the same, as they may agree."

Although the jointure agreement of the West Shore Joint Senior High School provided for a joint committee, it reserved the power of condemnation to the joint board in these words: "the selection of sites, and the approval of building programs shall be performed by the Joint Board." The selection of any site and the condemnation of the same would therefore be controlled by section 1704, above cited, rather than section 1707 of the same act, 24 PS §17-1707, regulating the procedures of joint school committees.

To determine what matters are required by law to be decided by a vote of the majority of all the directors of a school district we turn to section 508 of the same act, 24 PS §5-508, where it is provided:

"The affirmative vote of a majority of all the members of the boards of school directors in every school district, duly recorded, showing how each member voted, shall be required in order to take action on the following subjects:"

Among the subjects so listed is: "Purchasing, selling, or condemning land."

Reading further in the Public School Code we find that the power to acquire sites is given in section 703 of the act, 24 PS §7-703, as follows:

"In order to comply with the provisions of this act, and subject to the conditions thereof, the board of school directors of each district is hereby vested with the necessary power and authority to acquire, in the

name of the district, by purchase, lease, gift, devise, agreement, condemnation, or otherwise, any and all such real estate, either vacant or occupied, including lands theretofore occupied by streets and alleys which have been vacated by municipal authorities, as the board of school directors may deem necessary to furnish suitable sites for proper school purposes for said district. . . ."

Section 721 of the Public School Code, 24 PS §7-721, authorized condemnation in the following language:

"Whenever the board of school directors of any district cannot agree on the terms of its purchase with the owner or owners of any real estate that the board has selected for school purposes, such board of school directors, after having decided upon the amount and location thereof, may enter upon, take possession of, and occupy such land as it may have selected for school purposes, whether vacant or occupied, and designate and mark the boundary lines thereof, and thereafter may use the same for school purposes according to the provisions of this act. . . ."

In our opinion, a careful reading of the above sections of the School Code shows that it was the intention of the legislature to vest in joint boards the power to condemn lands for school purposes. An application of logic and common sense to these provisions brings us to that conclusion. We will analyze them as follows:

In section 1701, the boards of school directors in any two or more school districts, may establish, construct, equip, furnish and maintain joint schools. Once the joint school has been organized the affairs of the same shall be supervised and directed jointly by the several boards of school directors who are authorized to meet jointly and exercise the same power and authority over the same as the several boards exercise over the schools in their respective districts. The power and authority of each board in its own district, it

must be admitted, includes the right to pick sites and condemn lands for school purposes. As showing that the power vested in joint boards was intended to be all inclusive, section 1704 directs that any matter required by law to be decided by a vote of the majority of all the directors of a school district shall in a joint school be required to be decided by a vote of two-thirds of all the constituent boards comprising said joint operation.

In section 508 we find a list of the acts on which a school district must have a majority vote. Among those things requiring a majority vote is purchasing, selling or condemning land. The requirement of a two-thirds vote as set forth in section 1704 in matters requiring a majority vote by individual boards, is the legislature's way of saying that it was the intention of the preceding portion of section 1704 to vest in joint boards all the power and authority which the several boards exercise in their respective districts unless otherwise specified in the School Code.

The last sentence of section 1704 to the effect that title to any real estate acquired for the purpose of establishing a joint school shall be held in one or more of the districts further emphasizes the intention of the legislature that a joint board shall have the power to condemn land for school purposes.

Reading the Public School Code of 1949 as a whole, we come to the inescapable conclusion that it was the intention of the legislature to extend the condemning powers set forth in sections 703 and 721 to the condemnation of land for and by joint school districts.

We are supported in this view by an outstanding line of judicial authority in Pennsylvania. We cannot find a single Pennsylvania case which has denied this power when the same was submitted for decision.

In 1941, Judge Ervin, then a Common Pleas Judge of Delaware County, now a Judge of the Superior

Court of Pennsylvania, handed down a decision holding specifically that a joint school board had the power to condemn land for school purposes. That case was Hardy v. Marple-Newton Joint High School District, 31 Del. Co. 112. Although the School Code of 1911 was in effect at that time, the provisions of that code were substantially similar to the provisions of the present code as will be noted from the following quotation from Judge Ervin's opinions:

"Section 1801 of the School Code, which is above set forth in full, gave to the two school boards the power to establish, construct, equip, furnish and maintain a joint high school. The specific power thus granted by the legislature does include the implied power to do all things necessary to accomplish the objects of the main power specifically given."

In Mundis v. Southeastern Joint School District, 63 York 165, decided in 1949 when the School Code of 1911 was still in effect, President Judge Sherwood, of the Common Pleas Court of York County, held that joint school districts have the right to condemn private property under the School Code.

In Hunlock Township School District v. Northwest Joint School District of Luzerne County, 380 Pa. 464 (1955), the Supreme Court in an opinion written by Justice, now Chief Justice, Jones, decided that the purchase of a school site by a joint school district could be accomplished by the favorable vote of two-thirds of the constituent school boards of the school district. The language of the Supreme Court is interesting to note.

"The answer to the question here involved is to be found in the plain language of Section 1704 of the Public School Code of 1949, P. L. 30, as amended by Section 1 of the Act of June 28, 1951, P. L. 934, 24 PS §17-1704, which provides as follows: 'The affairs of joint schools or departments shall be supervised and

directed (1) jointly by the several boards of school directors, establishing and maintaining such joint schools or departments, or (2) by a joint school committee. . . . When there is no joint school committee, the several boards of school directors are hereby authorized to meet jointly, and exercise the same power and authority over the same as the several boards exercise over the schools in their respective districts. Whatever matter is required by law to be decided by a vote of the majority of all the directors of a school district shall in a joint school or department be required to be decided by a vote of two-thirds of all the constituent boards comprising said joint operation. The vote of any constituent board shall be determined by a majority vote of all the school directors comprising such constituent board. In addition thereto, the matter shall have been voted for by a majority of all the school directors of all the constituent boards. . . .'

"The matters required by law to be decided by a vote of a majority of all the directors of a school district are set forth in Section 508 of the Public School Code of 1949, amended by Section 1 of the Act of May 10, 1951, P. L. 287, and by Section 1 of the Act of September 28, 1951, P. L. 1546, 24 PS §5-508. Among such matters is 'Purchasing, selling, or condemning land.' It is evident, therefore, that in authorizing the purchase by the joint district of the properties involved all that was required was a two-thirds affirmative vote of the boards of the constituent districts of the joint district. And, that requirement was met. Each of the resolutions was adopted by the affirmative vote of two-thirds of the boards of the constituent districts and, in addition, by a majority vote of all the directors of the boards of the district as required by Section 1704."

We see no reason why it would not follow from the above clear reasoning of the Supreme Court that a joint school district has the right to condemn as well as purchase land as long as the vote requirements are met. In this regard we wish to quote the following statement by President Judge Sherwood in the Mundis case cited above, page 168:

"To construe the Act to mean that a joint school board is limited in the acquisition of land for school purposes to purchase alone would lead to a ridiculous conclusion in which landowners could demand exorbitant prices and thus defeat the power of joint school boards to establish joint schools."

In Spann v. Joint Boards of School Directors, 381 Pa. 338 (1955), the Supreme Court of Pennsylvania decided that a joint school board proceeded in the manner prescribed by law to condemn land required for school purposes. All the proceedings were taken by the joint board of school directors. Objection was made that certain conditions precedent had not been met. Although no objection was made to the power of a joint school board to condemn land for school purposes, it is obvious that everybody concerned, including counsel and the court, was satisfied that such power exists in joint school boards.

In an opinion handed down by Judge Homer L. Kreider, in the Dauphin County Court of Common Pleas, on December 27, 1956, in the case of Schmiedel v. Dauphin Borough School District, 10 D. & C. 2d 620, Judge Kreider reviewed the foregoing statutes and cases. He held that a joint school board has the implied power to condemn private property for public school purposes. We are in hearty accord with the conclusion reached by Judge Kreider in his able and well written opinion.

We hold that the West Shore Joint Senior High School Board has the power to acquire private property by condemnation for public school purposes.

*4. Do the prior condemnation proceedings bar the present proceeding?*

The landowners claim that the joint board has no power to condemn the lands in question because said lands are already condemned. They refer to the two prior condemnation preceedings recited in the statement of facts above, the first being a proceeding instituted in the name of the Lower Allen Township School District and the second being a proceeding instituted in the name of the four Cumberland County School Districts.

The brief submitted on behalf of the landowners has already answered their contention on this matter. The proceeding instituted in the name of Lower Allen Township was discontinued by order of this court on November 12, 1955, and the proceeding instituted in the names of the four Cumberland County Districts was discontinued by order of this court on March 13, 1956. Neither condemnation was in effect in any way on March 15, 1956, when the condemnation resolution in the present cases was passed, or on March 16, 1956, when the representatives of the joint board entered on the land and marked the boundaries.

In each prior proceeding the order of court granting a discontinuance was effective to end the condemnation. If the landowners wished to object to the power of the court to grant a discontinuance they should have done so at the time it was requested. In both cases the discontinuance was granted after issuance of rule therefor was waived by counsel for the landowners.

*5. Has adequate compensation been secured to the owners of the land?*

We are of the opinion that the legislature intended to pledge the taxing power of the several school districts making up the jointure as security to the land-

owners for any damages they may sustain on account of the condemnation. The landowners' argument with the stress it lays on inadequacy leads us to believe that they do not seriously question this proposition.

Section 1701 of the Public School Code of 1949, 24 PS §17-1701, provides, inter alia, as follows:

"The cost of establishing, constructing, equipping, furnishing, and maintaining such joint schools or departments, including the cost of transportation of pupils, shall be paid by the several districts establishing the same, in such manner and in such proportion as they may agree upon."

Section 1702 of the same act, 24 PS §17-1702, has this to say about funds being raised by a joint school district to meet these expenses:

"Any school district joining in the establishment of a joint school or department, as herein provided, shall have the same power to raise the necessary funds to pay its share of establishing and maintaining such joint school or department as it has to raise funds to establish and maintain any public school."

This power of the individual district to raise funds to establish and maintain its public schools is, of course, the general taxing power of the school districts given in section 507 of the code, 24 PS §5-507.

Having thus given to joint school districts the power to establish schools, apportion the expense among the districts making up the jointure and providing that each district in the jointure may use its taxing power to pay its share of establishing such schools, it is obvious that the legislature intended the taxing power to be used for that purpose.

If the taxing powers of the individual districts can be used for the purpose of establishing joint schools, and if, as we have decided, the power to establish includes the power to condemn for that purpose, such

taxing power can be used for all other purposes in connection with condemnations authorized under the Public School Code, and the following section of the code would certainly apply to protect a landowner whose land has been condemned by a joint school district:

"The school funds which may be raised by taxation in any school district shall be pledged, and hereby are made security, to the owner or owners of any property taken for school purposes, for all damages they may sustain on account of taking of such property by the district for school purposes": 24 PS §7-722.

Spann v. Joint Boards of School Directors, 381 Pa. 338, cited above, was a case in which the joint school district condemned land for school purposes. The landowners raised the question of how their damages would be paid. In reply to this the Supreme Court said, inter alia:

"If the Authority financing should prove abortive, plaintiffs would still be afforded protection under Section 722 of the Public School Code of 1949 which makes school funds raised by taxation security for the price to be paid": Pages 350-351.

In the recent case of Schmiedel v. Dauphin Borough School District, cited above, Judge Kreider held that the taxing power of each of the several school districts comprising the jointure is security for the landowner in condemnation proceedings. We agree with that decision and hold that the taxing power of the districts comprising the West Shore Joint Senior High School is pledged as security to pay just compensation to the Keisers.

As the next part of their argument relative to security the landowners say that even if section 722 is available as statutory security to the landowners, it is not in fact security for the reason that it is inadequate. .

Article 1, sec. 10, of the Constitution of Pennsylvania prohibits the taking of private property for public use unless just compensation is first made or secured. The landowners claim that all the taxing power of the component school districts is being used for current budgets and no taxing power is available to secure their compensation.

The landowners claim that they have been damaged to the extent of $325,000. The highest professional appraisal secured by the joint board estimated the damages at $81,126. Are we then to fix the damages in order that we may determine whether or not the available taxing power of the districts is sufficient to secure the landowners? Of course not, this matter is not at issue and cannot be at issue before us until a board of view has fixed the damages.

However, if it were obvious that the school districts making up the jointure had no available taxing power, the landowners might be on firm ground in objecting to the adequacy of the security as not meeting the constitutional mandate. The landowners have admitted that under the taxing power as already exercised by the component school districts the sum of $92,090 has been earmarked as damages for their claims. In addition, they admit that the Lemoyne School District could raise an additional $15,000 by taxation, making admitted available taxing power or tax funds pledged in the amount of $107,000. Whether or not this will be sufficient to cover the amount of damages we will not know until an award has been made by a board of viewers, but we are satisfied that it is available and pledged under section 722 of the Public School Code.

In addition to the tax funds which the landowners admit are available, we feel that there are considerably more which are also pledged under section 722.

Under section 672 of the Public School Code of 1949, as last amended, 24 PS §6-672, school directors of the

third and fourth class are limited to a tax rate of 25 mills on the dollar of assessed valuation. They are also permitted to levy an additional tax to pay the minimum salaries and increments of the teaching and supervisory staff and also an additional tax to pay rentals due any municipality authority or due the State public school building authority. There is apparently no limitation on the mill rate which may be imposed by a third' class district for these purposes, but, inasmuch as New Cumberland is the only third class district involved and all the rest are fourth class districts, we will treat this matter as if all the districts involved were fourth class districts. Under this section it is possible for these school districts to levy taxes up to and including a 45-mill rate. However, for the purposes of this case we will not consider any portion of the tax power available to pay rentals to any authority and will consider the ceiling under this provision of section 672 as being at 35 mills. If 10 mills is being used to pay salaries of teachers and supervision in any district it can increase its mill rate to 35 mills.

The argument of the landowners that the only district which is now paying anything for salaries of the teaching and supervisory staff is New Cumberland is without merit. In each of the other districts an average of approximately 80 percent of its total 1956-1957 budget is paid to the jointure to which it now belongs, being jointures other than the jointure under consideration. We are not able to determine exactly how much of the money paid by each district to its jointure is used to pay salaries of professional employes, but we are certain that a great deal of it is so used because all professional employes are hired through the jointure. The landowners contend that the only portion of New Cumberland's expenditures payable to professional employes are those sums set up for direct payment to such professional employes. However, New

Cumberland also pays 29 percent of its revenues to a jointure to which it belongs other than the one under consideration, and we are satisfied that a large portion of this expenditure is used to pay professional employes. We feel that it is rather obvious that each district is now using at least 10 mills of its present tax rate to pay professional employes either directly or through the various jointures to which it belongs. Therefore, there is available as security for the landowners in addition to the amount included for them in the present budget the unused portion of each school district's taxing power up to 35 mills.

Using the full 35 mill rate the following unused portion of the mill rate is available in each district: New Cumberland, five mills; Lower Allen, three mills; Lemoyne, seven mills; Wormleysburg, nine mills; Lewisberry Township, five mills; Fairview Township, two mills. Reducing this to dollars there are available unused tax funds in the amount of approximately $100,000. Adding this to the $92,000 set aside under the current mill rates, there is a total of $192,000 pledged school funds.

Under section 672(b) of the code, cited above, tax revenues over and above the 35 mills are available to secure the landowners, by virtue of the provision authorizing financially handicapped and distressed school districts to levy an additional 10 mills on each dollar of the total assessment if certain conditions are met. We feel that unquestionably this emergency taxing power is available to protect the landowners should the necessity arise. Leaving out Newberry Township School District, which is already taxing at the rate of 45 mills, 10 mills levied on the total assessment of all the other school districts would produce an additional $207,000 for the protection of the landowners. This sum plus the foregoing $192,000 gives a total of $399,000, a sum in excess of the fondest hopes of the landowners.

We hold that the school funds which may be raised by taxation in the school districts making up the jointure are pledged as security to the landowners and that those school funds are adequate for the protection of the landowners.

*6. Was there a failure to agree on a purchase price?*

Section 721 of the Public School Code of 1949, 24 PS §7-721, contains the following provisions:

"Whenever the board of school directors of any district cannot agree on the terms of its purchase with the owner or owners of any real estate that the board has selected for school purposes, such board of school directors . . . may enter upon, take possession of, and occupy such land as it may have selected for school purposes. . . ."

As a basis for condemnation it is therefore necessary to show that the condemning authority and the landowner were unable to agree on the purchase price. The landowners claim that this requirement has not been met.

The answer to the problem of whether or not the parties were unable to agree on the terms of the purchase is derived from facts rather than theory. Mr. Keiser knew during the Lower Allen proceedings that the site was being sought for the West Shore Joint Senior High School. We are satisfied that both he and his counsel knew all along that the joint board wanted the land and that every overture made was being made on behalf of the joint board. Although several offers were made to Mr. Keiser during the prior proceedings he never submitted a counter-offer, always indicating that he wasn't interested in selling. The facts of these prior proceedings show plainly that the parties were not able to agree on a purchase price.

The facts themselves demonstrate that all proceedings, including the prior proceedings and the present proceedings, are part of the same condemnation. How-

ever, if we forget all of the proceedings except the current cases, the parties still could not agree on the terms of the purchase. At the meeting on March 15, 1956, Mr. Keiser submitted a valuation figure in excess of $300,000. Although he said this figure was open to negotiation, when his testimony was taken later, he admitted that he would not have accepted $250,000 on March 15, 1956. On March 15, 1956, the joint school board representatives and Mr. Keiser met for more than two hours. With appraisals in their hands showing the valuation of the land to be less than $100,-000, it is obvious that it would have been useless for the joint board representatives to make an offer near their appraisals. They were justified in coming to the conclusion that negotiations with Mr. Keiser on any terms other than his would have accomplished nothing.

Spann v. Joint Boards of School Directors, 381 Pa. 338, cited above, covers this situation rather thoroughly and we quote from it as follows, page 346:

"There was also sufficient evidence to support the chancellor's conclusion that the parties were unable to agree with the plaintiffs on the terms of purchase. As stated by the chancellor in his adjudication 'The statute does not specifically require an offer of a specific sum of money. It does require evidence that the parties cannot agree. Here this fact is supported by all the evidence offered by defendants and plaintiffs. Three times authorized agents of the board discussed with Martin Spann the question of securing part of his land for school purposes. *On each occasion he stated that his land was not for sale, and he attempted to divert the attention of the board to other land. It is a well established rule of law that a tender is excused where such a tender would be a useless and idle ceremony:* Phillips vs. Telzner, 357 Pa. 43. Certainly in

this case it would have been idle and useless.' Furthermore, it has been held that since resolutions affecting condemnation could not be passed until there had been a failure to agree, the resolutions presuppose such inability to agree, and the regularity of the proceeding will not be inquired into when the condemnation resolutions are, as here, placed on the minutes, unless there is an affirmative showing that the minutes had no basis in fact or were fraudulent: Jury et al. vs. Wiest et al., 326 Pa. 554." (Italics supplied.)

We hold that the requirement that there be a failure to agree on the terms of purchase before condemnation has been fully met.

### Order

And now, January 24, 1957, at 9:30 a.m., the rules to show cause granted on May 1, 1956, in the above cases are discharged at the cost of the landowners, and the viewers heretofore appointed are directed to proceed with the performance of their duties. A hearing is fixed for Wednesday, February 13, 1957, at 2 p.m., at which time the viewers shall view the premises. Petitioners, being the joint school board, are directed to give at least five days notice of the time and place of said hearing to the viewers, the landowners and other parties interested.

### Exceptions to Report of Viewers

JACOBS, J., July 16, 1957.—On April 2, 1957, the report of the viewers appointed by this court in the above condemnation proceedings was filed and confirmed nisi. Exceptions were filed by the landowners to the report of the viewers. These exceptions for the most part repeated the objections heretofore made to the appointment of viewers which were the subject of an opinion and order of this court dated January 24, 1957, and reported herewith. The exceptions dis-

posed of in the order of January 24, 1957, were not pressed by the landowners at the argument held on June 18, 1957.

The landowners claim that the joint board did not meet the burden of proving that the condemnation resolution of March 15, 1956, was adopted by at least two-thirds of the constituent school districts, and this is the sole exception argued by the landowners. Joint board exhibit no. 11, being a minute of the meeting of the joint board held on March 15, 1956, shows that six, or the required two-thirds of the eight school districts making up the jointure, met in Lemoyne and properly passed the condemnation resolution, as a joint board and as separate boards acting separately. The minutes show that this meeting convened at 8:15 p.m. and adjourned at 9:30 p.m.

The landowners attempt to contradict the minutes of the joint board by showing minutes of three of the school districts constituting the two-thirds majority, namely, Wormleysburg, Newberry Township and Fairview Township. The minutes of these separate school districts which are Keiser exhibits nos. 40, 41 and 42, show that each of these boards met on the same night, to wit, March 15, 1956, at 9 p.m., in their separate districts, the meeting places being from two to ten miles away from the meeting place of the joint board. The minutes of the three boards acting separately negative the minutes of the joint board, according to the claim of the landowners. The landowners, therefore, state that the joint board had placed upon it the burden of showing that its minutes were correct and that the minutes of the three separate districts were incorrect.

In the first place we disagree with the landowners that the minutes of the meetings of the three separate districts negative the minutes of the joint board.

Even if the minutes of the separate boards are correct and admissible, the joint board had plenty of time to pass the joint resolution and the separate resolutions before it was necessary for the members of the three individual boards to leave in order to get to their meetings by 9 p.m. It is interesting to note that the joint board minutes show that a 20-minute recess occurred at 9 p.m. The three boards having left, the members remaining could easily have continued the meeting on other matters until 9:30 p.m. Even giving the minutes of the separate boards full effect, we would not be justified in holding that they negative the minutes of the joint board.

There is another reason why the minutes of the meetings of the separate boards cannot contradict the minutes of the meeting of the joint board. Article IV, sec. 433, of the Public School Code of 1949, 24 PS §4-433, directs the secretary of the board of school directors to keep a correct and proper record of all the proceedings of the board. The code therefore makes the minutes of a school board meeting a public record required to be kept, and cases and rulings applicable to such public records are controlling in this case. The legislature having required these minutes to be kept, it is a well known principle of law that they are conclusive of the facts therein contained and cannot be contradicted by extraneous evidence on the trial of a collateral issue unless fraud is proved or alleged. This principle is well set forth in a case involving the minutes of township supervisors originating in Cumberland County. The case referred to is Geiser Manufacturing Company v. Frankford Township, 40 Pa. Superior Ct. 97.

This principle has been consistently followed by Pennsylvania courts. For example, in a case involving a contract to supply a school bus, the court said:

"It is well established that an appointment (or a contract) by a School Board cannot be enlarged, diminished, supplemented or in any manner changed by evidence extraneous from the minutes, or by the actions or declarations of the officials of the School District": Matevish v. Ramey Borough School District, 167 Pa. Superior Ct. 313.

The same ruling has been applied in a case where a school teacher brought a writ of mandamus demanding that the school directors acknowledge her as a permanent employe: Commonwealth ex rel. v. Sunbury School District, 335 Pa. 6. In reversing the lower court the Supreme Court said:

"The court below based its conclusion that plaintiff was a regular teacher upon evidence, extraneous from the minutes, of certain actions taken by various school officials which purported to enlarge plaintiff's status from that of a 'supply teacher' for a limited period to that of a regular employe. It is clear, however, that this finding cannot be sustained, since proof of plaintiff's appointment is the minutes, and the terms of her selection cannot be supplemented or enlarged by extraneous evidence or by the actions or declarations of the officials of the School District."

The minutes of the three separate boards, whether written or not, are extraneous evidence which cannot be used to contradict the minutes of the joint board and in the absence of a charge by the landowners that the minutes of the joint board are fraudulent or in bad faith, we hold that they are conclusive as to the facts therein contained.

In the case of Toye v. Exeter Borough School District, 225 Pa. 236, Toye was employed by the school board as principal for a term of three years. He was dismissed by the board at the end of the first year of his employment upon the ground of incompetency and

neglect of duty. He alleged that his dismissal was without cause and brought suit against the school district to recover his salary for the balance of three years. The court pointed out that Toye did not allege that the board of directors acted corruptly or in bad faith in dismissing him, and went on to say, pages 241-242:

"The action of the board was regularly entered upon the minutes, and in the absence of any charge by the plaintiff in his statement, of bad faith, or abuse of power upon the part of the board, the minutes were conclusive, as to the propriety of his dismissal. . . . The only thing charged against the district was violation of the contract, without any allegation of bad faith, and in the evidence in chief of plaintiff, it was shown that he was dismissed upon the avowed ground of incompetency and neglect of duty, by the unanimous vote of the board. Under this showing, the minutes of the board were under the authorities above cited conclusive, and it was error in the trial court to permit evidence to be introduced to contradict the minutes."

In answer to the suggestion of the landowners that the burden of proving the minutes of the joint board shifted to the joint board when the minutes of the separate board meetings were introduced, we wish to call attention to the last paragraph of the Toye case, last above cited.

"The trial judge seems to have misconceived the entire situation. In the face of the evidence introduced by plaintiff showing his dismissal upon the ground of incompetency and neglect of duty, he placed the burden of justifying its action upon the board of directors, and when the board attempted to assume this burden, *improperly placed upon it*, the trial judge sustained the objection of counsel for plaintiff and excluded the testimony of the witnesses for the defendant, called to prove the incompetency of the plain-

672

tiff, and his neglect of duty. The theory upon which the case seems to have been tried was entirely wrong, and the judgment is reversed." (Italics supplied.)

*Order*

And now, July 16, 1957, 9:15 a.m., on the basis of the above opinion and the reasons set forth in the same case reported herewith, the exceptions of the land-owners to the report of the viewers are dismissed.